```
 1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK
 2

 3   ------------------------------------X
                                        :
 4   HEATHER ZHAO,                      :    13-CV-2116 (PAC)
                                        :
 5                        Plaintiff,    :
                   v.                   :
 6                                      :    500 Pearl Street
     DEUTSCHE BANK AG,                  :    New York, New York
 7                                      :
                        Defendants.  :    October 31, 2013
 8   ------------------------------------X

 9
          TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY CONFERENCE
10          BEFORE THE HONORABLE DEBRA C. FREEMAN
                 UNITED STATES MAGISTRATE JUDGE
11

12   APPEARANCES:

13   For the Plaintiffs:        DAVID GOTTLIEB, ESQ.
                                MATTHEW PISCIOTTA, ESQ.
14                              Wigdor LLP
                                85 Fifth Avenue
15                              New York, New York 10003

16

17   For the Defendants:        ELIZA KAISER, ESQ.
                                Kramer, Levin, Naftalis & Frankel
18                              1177 Avenue of the Americas
                                New York, New York 10036
19

20

21   Court Transcriber:         SHARI RIEMER
                                TypeWrite Word Processing Service
22                              211 N. Milton Road
                                Saratoga Springs, New York  12866
23

24

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

2

1          THE COURT: Hi.  It's Judge Freeman.  Good morning.

2          MR. GOTTLIEB: Good morning, Your Honor.

3          THE COURT:  Who do I have on for plaintiff?

4          MR. GOTTLIEB: This is David Gottlieb from Thompson

5    Wigdor for the plaintiff and I'm also here with Matt

6    Pisciotta, an associate whose admission in the Southern

7    District is pending.

8          THE COURT: Okay.  And who do I have for defendant?

9          MS. KAISER:  Sure.  It's Eliza Kaiser for Deutsche

10   Bank and sitting here with me is Samantha Keegan whose

11   admission in the Southern District is also pending.

12         THE COURT: Well you're balanced.

13         MS. KAISER: We are.

14         THE COURT: You should introduce each other.

15         So I have this discovery dispute in front of me.

16   It's a new case.  I have it for general pretrial supervision

17   so I should talk to you in general about my supervision of the

18   case and what that will entail and you get an overall sense of

19   things and then I have this particular discovery dispute about

20   electronic discovery and search terms.

21         Can somebody, first of all, bring me up to date on

22   where things currently stand in discovery as a whole, whether

23   you have some deadlines in place, whether you need deadlines

24   in place, whether you're working otherwise well together or

25   not?  Just give me just the global story.

3

1          MR. GOTTLIEB: Sure, Your Honor.  At this point I

2     think I can safely say we've been working well together in

3     discovery.  At this point both sides have served document

4     requests and interrogatories.  Both sides have responded to

5     those discovery requests and we, plaintiff has served a

6     deficiency letter on defendants and I'm sure defendants will

7     probably be doing one of their own and we will then work to

8     resolve those issues before making any potential motions to

9     compel.

10          THE COURT: So you have a deadline in place for close

11     of fact discovery?

12          MR. GOTTLIEB: We do.

13          MS. KAISER: Was it February --

14          MR. GOTTLIEB: 14th.

15          MS. KAISER: Yes.

16          MR. GOTTLIEB: February 14th is the close, the current

17     deadline for the close of discovery, Your Honor.

18          THE COURT: So that still gives you some time on the

19     clock.  You think that's going to work?

20          MR. GOTTLIEB: Well, we still have a -- we have a

21     significant amount of discovery to do in terms of a number of

22     different items and then of course there will be a number of

23     depositions.  So with the holidays coming up I'm not sure what

24     we're going to be able to resolve and what we're going to need

25     to make motions on if any.  So I think it's too early to tell

4

1   whether we'll be able to really get everything done by

2   February 14th but we're certainly making our best efforts to

3   get everything done in an expeditious manner.

4           MS. KAISER: I concur with that, Your Honor.

5           THE COURT: Well, my advice on this is don't wait too

6   long to sketch out when depositions are going to be on the

7   calendar especially if you have a holiday season.  Talk to

8   each other about who the witnesses are, get the notices out so

9   you can be negotiating about dates and talk to your -- talk to

10  the witnesses about their availability, talk to each other

11  about availability and sketch it out on the calendar and you

12  say all right, we have until February 14, we assume that there

13  are going to be a lot of depositions in January, what does

14  everybody's calendar look like in January, can we reserve this

15  week or that week to try to get some depositions done and have

16  a plan because the longer you wait to try to have a plan with

17  all different moving parts the harder it is to make it happen

18  and then you'll be saying Judge, we tried but this one is away

19  or I'm busy or something.  But if you planned ahead of time

20  you might have avoided that problem.

21          MR. GOTTLIEB: Your Honor, I agree with the

22  sentiments wholeheartedly.  We currently have a number of

23  different document discovery issues that will likely need to

24  be resolved before we can take certain depositions and I don't

25  think we need to get into all of those document issues today

1   because again the parties are trying to work them out

2   informally.

3           THE COURT: Okay.

4           MR. GOTTLIEB: But the -- it may be difficult for us

5   to schedule depositions until certain document issues are

6   resolved first.

7           THE COURT: Right.  But you can schedule them a

8   little bit farther out and you can keep an eye on those dates

9   as you're working through document issues and you can say

10  look, we need to get these document issues resolved no later

11  than such and such a date so that if documents are going to be

12  produced they can be produced no later than such and such

13  other dates so we can review them in time for this deposition

14  and it will really make you see what has to happen and then if

15  you see a problem you'll know when you need to get in touch

16  with me and say this is why this is going to upset the apple

17  cart on the schedule you've worked out and this is why we need

18  your attention soon and we've been negotiating a little bit

19  faster because we see that all coming as opposed to just

20  letting it drift and then saying well, we won't put

21  depositions on the calendar until we work out the document

22  issues, we're not going to work out the document issues until

23  we first do our letters and talk.  If you look from the back

24  end forward you'll see that kind of pressure you need to put

25  on yourself to try to get these things worked out or at least

1   for my attention.

2           If you send something to me for my attention and

3   you've tried really diligently and I hold you up I will

4   obviously give you more time.  I'm not going to penalize you

5   because of my delay.

6           Let me turn to the particular issue that you told me

7   about which I assume is still an open issue about the email?

8           MR. GOTTLIEB: Yes, Your Honor.

9           MS. KAISER: Yes, Your Honor.

10          THE COURT: So as I understand it there are -- the

11  plaintiff -- the first issue is that terms related to the

12  reduction in force but not connected to plaintiff's name in

13  particular and whether those should be included in searching

14  emails of three particular custodians, why is defendant's view

15  that the reduction in force terms should be searched only in

16  conjunction with plaintiff's name?  Might there not be

17  relevant evidence come up about the reduction in force?

18  Wouldn't you in fact say that there's evidence about the

19  reduction in force that would be relevant not only in

20  conjunction with plaintiff's own name?

21          MS. KAISER: Sure, Your Honor.  So, first of all, as

22  you know this is a single plaintiff discrimination case about

23  Ms. Zhao and about her termination from Deutsche Bank and her

24  selection for inclusion in the reduction in force that

25  occurred at the end of 2012.  There were 87 people terminated

1   in the reduction of force, that it was a worldwide reduction

2   in force across different business units of Deutsche Bank.

3   There were different decision makers who made the termination

4   decisions for the different business units at issue.  So we've

5   identified Benjamin Pace as being the decision maker who

6   elected to include Ms. Zhao in the reduction in force.

7           THE COURT: So why wouldn't -- why would documents in

8   the custody of that individual who was the decision maker in

9   her particular case be particularly relevant regards as to

10  whether they mention her name if you can see this decision

11  maker's sort of thought process as to who should be let go and

12  who should not be let go in a reduction of force even if you

13  don't do something company wide?

14          MS. KAISER: Well, so Mr. Pace made decisions -- I

15  mean with reference to business [inaudible] other than Ms.

16  Zhao's so he would have made decisions concerning many more

17  business areas in other parts of the world and I'm not sure

18  how many people who reported up to him were terminated.  I

19  don't know of the 87 the exact number but the fact is we would

20  be forced to provide information about other employees who

21  were selected for termination and obviously that implicates

22  some pretty significant employee confidentiality concerns.

23          THE COURT: Don't you have already have a

24  confidentiality stip in place in the case?

25          MS. KAISER: We do.  We do.  And the concern also

1  being that these people were at different levels and different

2  business areas and are not people who were similar to Ms. Zhao

3  in terms of their job functions, in terms of their titles and

4  so it's just -- we think it's a stretch.

5          With respect to the other custodians, Ms.

6  Kirschenbaum for instance, the HR person, she oversaw the

7  entire -- as a business partner for HR she oversaw the entire

8  private wealth management division.  So that's an even larger

9  business area than Mr. Pace was responsible for.  So again

10 there would be people in completely different business areas

11 than Ms. Zhao who Ms. Kirschenbaum may have emailed with

12 respect to.

13         Again, we have concerns about what their -- there

14 would be different decision makers at issue for those

15 termination decisions and again we do have concerns about

16 employee confidentiality in protecting information about other

17 employees.

18         THE COURT: Well, I'm not as worried about the

19 confidentiality issues because we can deal with through

20 confidentiality protection.  Obviously there's already a rule

21 in place that says you don't file anything on the public

22 docket that has personal identifying information and to the

23 extent that there's material in personnel files or just the

24 documents that come up through email searches, if there's

25 information that has to do with other employees' job

9

1  performance or things that are confidentiality it's

2  appropriate to keep that confidential at this stage and to

3  have a confidentiality order cover that.  But usually in

4  discrimination cases if you can identify the decision maker

5  then other decisions made by that same decision maker

6  especially in the context of the same business event, the

7  reduction of force would be relevant and usually appropriate

8  to produce.  I guess the question -- maybe I should direct

9  this to plaintiff is how do you keep this from being over

10  broad and potentially over burdensome while still getting at

11  the conduct of the decision maker or decision makers here.

12         MR. GOTTLIEB: Well, Your Honor, I think we've

13  already done that and the way we've done that is by limiting

14  the RIF related search terms to really a limited number of

15  people, three people who defendants have represented were the

16  three people directly involved in the RIF.  We've limited --

17         THE COURT: Directly involved in the reduction in

18  force or directly involved in the decision to terminate her in

19  that reduction in force?

20         MR. GOTTLIEB: The latter, Your Honor.  It would

21  directly involve in the decision to terminate Ms. Zhao, the

22  plaintiff.

23         And in addition, Your Honor, we've also limited the

24  RIF related search terms to a temporal period during which the

25  RIF took place.  So, for instance, other terms related to Ms.

1   Zhao's performance and other related issues we searched -- we

2   agreed to a search times of a number of years but the RIF it's

3   only a limited period of time.

4           To the extent there are some documents that the

5   search terms yield that are not directly related to Ms. Zhao's

6   termination or her group I mean that's what happens in -- when

7   we do [inaudible] search protocols and what we're attempting

8   to accomplish with the protocols to make sure that we are

9   capturing as many relevant documents as possible and the fact

10  of the matter is in these types of situations the defendants

11  often need to review the documents and determine which ones

12  are relevant and responsive and which ones are not.  So part

13  of the nature of --

14          THE COURT: Well, hold on a second.  In terms of

15  what's relevant in response what you're saying is search --

16  use these search terms to search through these people's emails

17  but then don't produce that universe.  You're saying go

18  through them and only produce documents that are responsive to

19  particular document demands; is that right?

20          MR. GOTTLIEB: Well, yes.  I imagine that defendants

21  are going to conduct a review of all the documents that the

22  search terms yield and give privilege review of course and

23  give review for documents that are completely irrelevant.  So

24  I imagine that would be part of the process.

25          THE COURT: Well, I think the defendants are going to

1  say a lot of documents are irrelevant that you're not going to

2  say are irrelevant but the question is not really that.  The

3  question is what is the -- maybe you have it in these papers.

4  It's been a while since I looked at them but what are the

5  particular document requests to which you believe these would

6  be responsive.   The document request is not in and of itself

7  all documents, all emails sent to or from this person, right,

8  regarding --

9            MR. GOTTLIEB: That's correct.

10            THE COURT:   -- production in force.  It's a document

11  request that is documents related to the decision to terminate

12  her or documents related to something else.  And what is the

13  request that's at issue?

14            MR. GOTTLIEB: Well, Your Honor, there are really a

15  number of different requests that would be at issue but we

16  certainly asked for documents related to the criteria used in

17  the RIF, documents related to the way Ms. Zhao was evaluated

18  and considered in connection with the RIF and the way other

19  people within her group were evaluated for termination or lack

20  thereof in connection with the RIF.  So really what we're

21  interested in is we want to know what the criteria was for the

22  RIF so we can then evaluate whether Ms. Zhao was properly

23  selected or whether she did not fit the criteria and therefore

24  the RIF was really used as a pretext but also to show how

25  others were evaluated.

1          THE COURT: Let's say for example there's an email

2   where one of these people says to another one of these people

3   or somebody else for that matter under the RIF let's consider

4   terminating Mr. John Doe whose performance has not been that

5   strong over the last few years.  Now, that would be a document

6   responsive to some request and if so, what request would that

7   be responsive to?  You've got to kind of pin this down to what

8   it is you're looking for and think about what kinds of

9   documents you're likely to capture and why you're looking for

10  them.

11          MS. KAISER: Your Honor, if I may just respond to the

12  point that counsel made?

13          THE COURT: Sure.

14          MS. KAISER: So, first of all, with respect to the

15  criteria used for the RIF process and Mr. Gottlieb has not

16  received our response yet to claims deficiency letter so I'm

17  not sure that this issue is crystal clear for plaintiff but we

18  are -- we have sort of reassessed plaintiff's request and we

19  are going to be circling back to our HR department and seeing

20  if they have any documentation concerning the criteria used to

21  select people for inclusion in the RIF.  We are going to be

22  conducting a targeted search for that type of documentation.

23  So I think rather than conducting wide ranging email searches

24  for that documentation we can do it in a more targeted way and

25  obviate the need for ESI searches on that basis.

13

1        With respect -- then the other purported reason that

2   plaintiff's counsel stated that they need the searches

3   conducted is an order to determine why Ms. Zhao was selected

4   for the RIF.  We have agreed to use these RIF terms in

5   connection with her name and therefore would uncover those

6   documents by running such searches.

7        I also want to make the point that Mr. Gannem is one

8   of the people that they've included in this request as a

9   custodian and we have not identified Mr. Gannem as being a

10  decision maker.  It was Mr. Pace as I said before who we've

11  identified as the decision maker.  So I just don't see the

12  relevance frankly of Mr. Gannem as a custodian to the extent

13  Your Honor orders such searches.

14        MR. GOTTLIEB: Well, that last point never came up

15  before until just now and Mr. Gannem was the supervisor of her

16  group and the global head of private markets.  So I really --

17  I think he's certainly appropriate for -- to be one of the

18  custodians.

19        But in terms of -- I mean if the defendant is

20  circling back to look for documents related to the criteria I

21  mean that's -- that's great but I don't know what that entails

22  but what I do know is that we need to have emails that reflect

23  the criteria used, not just maybe some document that says

24  these are what you should consider.  We need to look at the

25  emails surrounding the RIF and look at what the decision

1  makers were considering and that will be -- we'll see that

2  through the emails, through the communications between all the

3  decision makers and those emails will very often I'm sure not

4  include Ms. Zhao's name.  Without those communications that

5  show what was being considered for the RIF how some people

6  were being evaluated versus others we're not going to be able

7  to inquire and investigate whether Ms. Zhao is being treated

8  differently than similarly situated men and that's what this

9  case is all about.

10          THE COURT: Have you agreed on what search terms

11  recently relate to the reduction in force and the only

12  question is whether they should be searched in the emails of

13  these three custodians?

14          MS. KAISER: The question, Your Honor, is whether the

15  search terms should be connected to her name or whether they

16  should be searched on their own right unconnected to

17  plaintiff's name?

18          THE COURT: But you agreed on those terms.

19          MS. KAISER: Yes, we have agreed upon those terms.

20          MR. GOTTLIEB: Yes, Your Honor.  And if I can -- if I

21  may Your Honor also.  We haven't talked about it but we also

22  have a disparate impact claim here and one of the elements of

23  a disparate impact claim is that we need to show that there

24  was a specific employment practice that's not capable of

25  separation.  So what that means is we need to show that the

1 | RIF, the process of the RIF was a specific employment
2 | practice, not a combination of a number of different events.
3 | So we need the communications and emails regarding the RIF
4 | will demonstrate whether this was a single process or whether
5 | it's capable of separation because that's certainly one of the
6 | defenses that the defendants are going to raise.  So, again,
7 | that's another reason why we need to see the communications
8 | between the decision makers regarding the RIF.  I think we
9 | solve any issues of over breath by the fact that we've limited
10 | the search terms to these five or six terms that we've already
11 | agreed upon and then also limiting it to the temporal period
12 | of August -- and it's August through January 2013.

13 | So I really think we've narrowed the search
14 | sufficiently to make it clear that we're only searching for
15 | documents that are going to be directly relevant to the
16 | plaintiff's claims.

17 | MS. KAISER: Your Honor, we respectfully disagree
18 | with that.  We've agreed to search the terms reduction, risk,
19 | head count, layoff, layoffs, layoffs and different iterations
20 | of that, terminate, fire and let go.  Again, our position is
21 | that should be connected to plaintiff's name.  Running the
22 | search terms across three custodians, one of whom is a
23 | business partner for Private Wealth Management which included
24 | I believe thousands of employees for even a five year period
25 | of time is likely going to produce a huge number of documents

16

1  most of which have nothing to do with Ms. Zhao.  We have

2  agreed to produce statistical information regarding the RIF.

3  Those are the hard copy documents that we have agreed to

4  produce.  The parties are still negotiating over the

5  parameters of what that production will encompass but we are

6  providing that statistical information about the RIF.

7           So to me that seems like a much more targeted way of

8  providing the information that plaintiff needs again rather

9  than just running these search terms for two senior managers

10  and an HR business partner over a period of five months

11  unconnected to plaintiff's name.

12           THE COURT: Well, maybe you --

13           MR. GOTTLIEB: Your Honor --

14           THE COURT: Wait, wait.  Maybe there's another way to

15  go about this.  Do you have the information as to who else was

16  let go within plaintiff's division or people who worked for

17  the same, reported to the same supervisors within the same

18  geographic office and/or practice area and/or level?  Do you

19  know the names of the people who were laid off and how they

20  fit into the business scheme?

21           MR. GOTTLIEB: Your Honor, the defendants -- we have

22  big disagreements over what the pool of people is that should

23  be considered in connection with the RIF.  So that's one of

24  the things that we're working out.  So we don't have the names

25  of the people who we think are sufficient and -- so that's

1  where we are on that.

2          But, Your Honor, the statistical data that the --

3          THE COURT: Well, hear me out.  Hear me out.

4          MR. GOTTLIEB: Sorry.

5          THE COURT: Discovery in a discrimination case should

6  go more broadly than discrimination solely about the

7  individual plaintiff.  Where you have allegations of conduct

8  by a particular decision maker it is reasonable to expand the

9  search to other conduct by that decision maker to others who

10  might be considered similarly situated.  Similarly situated

11  might be defined in a particular company by geography.  It

12  might be defined by time frame.  It might be defined by

13  practice group.  It might be defined by division.  It might be

14  defined based on a certain chain of command.  The question is

15  how is it best defined here and how is it -- what is the best

16  way to focus a search reasonably while still going beyond the

17  individual plaintiff.

18          I think the position taken by defendant that this

19  should be focused on the individual plaintiff is too narrow a

20  position.  Plaintiff's position might be too broad but it may

21  be that plaintiff doesn't know how to narrow it further

22  because of the limitations of the information that's been

23  produced to date.  For example, you might say we also know

24  there were three other people in the same division, in the

25  same office who were also terminated, they were also women or

1  they were also something else, similar in some other way and

2  if we had their names then we can run the terms regarding

3  their reduction in force and also their name or maybe we just

4  do searches with respect to the person known to be the

5  decision maker and see what that yields, see how many scores

6  or hundreds or thousands of emails that produces.

7          I'd like to remind you that when a party is

8  objecting on the grounds of burden it is that party's burden

9  to demonstrate the burden and you can't just say it's likely

10  to result in lots of emails.  If you actually run a search and

11  you come back and you say it has yielded four million emails

12  okay, well that tells us something.  If you say the burden is

13  going to be in reconstructing things that are on a server

14  that's not in use any more, we're going to have to hire a

15  forensic team to get things out of storage and whatever, it's

16  going to cost us this much, all right you're demonstrating

17  burden.  Right now the burden sounds like it's not well

18  substantiated and the position seems too narrow.

19          But, on the other hand, I don't want a situation

20  where the burden becomes extreme and where you're going to

21  across division lines and geographic lines to the extent where

22  you're really looking at people who are not similarly situated

23  and you're really looking at stuff -- it's too far afield from

24  the claims in the case.

25          So I think a) a little further discussion is in

1   order; b) a little further homework is in order, and I'm going

2   to tell you now that I'm going to order production beyond what

3   defendant wants.  The question is how far beyond.  Defendant

4   might want to say all right, you know what, we will provide

5   the names and the positions and the divisions and the chains

6   of supervisors of the other people who were let go and here

7   are the six who we think are rational comparators who had the

8   same decision maker and I might say okay, let's focus it that

9   way.  Or defendant might not want to do that.  I might say all

10  right, let's start with Mr. Pace and his emails and see what

11  that yields and go back and talk about it a little further and

12  see where you are.

13          It may be it doesn't yield all that much or not that

14  much that can't be searched and bear in mind as you have some

15  further discussions about this keep an eye on what exactly is

16  the document request, what exactly are we looking for here.

17  The answer is we're not looking for the emails.  We're looking

18  for emails with respect to something and the question is what

19  is the something.  Is it criteria for reduction in force?  Is

20  there a better way to do that?  Is it how criteria were

21  applied to particular people where Mr. Pace was the decision

22  maker, how Mr. Pace applied those criteria?  Is that what

23  we're looking for.  Because if you say counsel will do a

24  search of the documents for responsive documents, responsive

25  to what?  Make sure everybody knows what the task is, what

1  you're looking for and what you're not looking for and -- what

2  I'd like to do is give you a chance to talk about that a

3  little more in light of these comments and then reconvene this

4  call after you've had a chance to do that.  See if you might

5  be able to come up with a proposal.

6          Ultimately if it just turns on it's burdensome, no

7  we don't think it is that's going to be for defendant to

8  demonstrate maybe by an affidavit or declaration by a person

9  with knowledge as to what it would entail, et cetera, what

10 kind of costs would be involved based on something that's a

11 rooted in fact estimate.

12         MR. GOTTLIEB: Your Honor -- go ahead, Eliza.

13         MS. KAISER: What I was going to say, Your Honor, is

14 based on your comments defendant will go back and ascertain

15 the other individuals selected for inclusion in the reduction

16 in force by Mr. Pace and provide that information to plaintiff

17 as a starting point for moving this process forward.

18         THE COURT: I think that would be helpful.  I'd like

19 to know, I'm sure plaintiff would like to know if that was one

20 other person or 12 other people or 50 other people or 300

21 other people or what.  I don't know how many people were let

22 go and I don't know the extent to which Mr. Pace was involved

23 in the decisions broadly but I think that would be telling.

24 If it turns out he was involved in a lot of decision making

25 that tells you something about this search effort.  If he was

1   involved with very few people that tells you something about

2   this search effort.

3          MR. GOTTLIEB: Your Honor, if I may.  We have

4   significant disagreement about who the decision makers were

5   here and who the proper comparators are and that's something

6   that we worked -- that we're working through and something we

7   described in detail in the deficiency letter.  So I think

8   we're going to have a really hard time --

9          THE COURT: Well, let me make --

10         MR. GOTTLIEB: [Inaudible]

11         THE COURT: Let me get a snapshot of how plaintiff --

12   I gather you think these three people are logical decision

13   makers and defendant is saying this was the person who decided

14   on plaintiff.  But let me get a --

15         MR. GOTTLIEB: These were -- sorry.

16         THE COURT: Let me get an idea from plaintiff's side

17   what you think the criteria, the perfect criteria would be for

18   comparators.  What are you looking at?  If you were to say

19   this person -- the criteria was used to evaluate whether this

20   person should be let go is appropriate to look at because this

21   person is in a comparable situation because why.  How does

22   plaintiff look at that question?

23         MR. GOTTLIEB: Well, in these types of cases, Your

24   Honor, generally it looks to where there's a common decision

25   maker and that's really what determines a similar situation in

1   RIF cases.  So at Deutsche Bank there's a group called Private

2   Wealth Management or previously called Private Wealth

3   Management and the head of that entire group, his name is

4   Kevin Lacoate and we originally requested that he be included

5   in the search protocol but defendant said that he was

6   essentially too high up in the chain, that he didn't really

7   have any input in the RIF.  So I said okay, let's go one step

8   below that.  So within Private Wealth Management there are a

9   number of smaller groups.  One of them is called Global

10  Investment Solutions.  Kareem Gannem is the global head of

11  Global Investment Solutions.

12          MS. KAISER: I'm sorry.  That is actually not

13  correct, David.  He's the -- Benjamin Pace is the head of that

14  group.  Sorry to interrupt you but just wanted to make sure

15  that was clear.

16          MR. GOTTLIEB: So Benjamin Pace is the head of Global

17  Investment Solutions and then there's Kareem Gannem who's the

18  head of -- I believe he's the head of Private Wealth

19  Management.

20          MS. KAISER: No, I'm sorry.  He's the head of Private

21  Market.

22          MR. GOTTLIEB: Private Market, excuse me.  Kevin

23  Lacoate is of course the head of Private Wealth Management.

24  Kareem Gannem is the head of Private Markets and that is where

25  Ms. Zhao worked.  So, again, rather than --

23

1          THE COURT: And what did she do?  What was her job?

2          MR. GOTTLIEB: Her job -- well, she had a few

3   different jobs because she was transferred during the course

4   of her employment but --

5          THE COURT: What kind of level was she?

6          MR. GOTTLIEB: She was a vice president and when she

7   started working there she was involved in launching investment

8   vehicles, evaluating investment opportunities, doing due

9   diligence on potential investment products.  She was then

10  transferred to a different group where she was involved in

11  going on road shows and presenting investment opportunities

12  internally to other branches and people at the bank.

13         THE COURT: So when there was a reduction in force

14  did it cut across all types of levels?  Did you have lower

15  level people laid off as well?

16         MR. GOTTLIEB: The reduction in force as Ms. Kaiser

17  represented at the start of the call was Worldwide but again

18  we agreed to limit the search custodian to the people who were

19  directly involved in the RIF at the Global Investment

20  Solutions and Private Market level.

21         THE COURT: That's not the question.

22         MR. GOTTLIEB: Those people being --

23         THE COURT: That's not my question.  My question is

24  let's say you have this particular division and this

25  particular division includes secretaries and it includes

1   people who work in a mail room or it includes people who would

2   answer the phones and include people who order the food for

3   meetings or whatever it is.  Did the reduction in force

4   involve people of those levels as well or was it more of a

5   we're going to save more money by laying off more high level

6   people and that's really what this is about?

7           MS. KAISER: My understanding, Your Honor, is that it

8   cut across all levels from non officers up into people who had

9   the managing director title which was the highest title at

10  Deutsche Bank.  So it was across titles, across business areas

11  and across the world as I mentioned earlier in the call.

12          THE COURT: This -- the people who were the head of a

13  particular department, did they -- is it your understanding

14  that they delegated decision making with respect to lower

15  level employees and reserved to themself with respect to

16  higher level employees or did they make the call for their

17  division at all job titles, all levels, all offices?

18          MS. KAISER: So my understanding is that Benjamin

19  Pace who was the head of GIS for the United States made the

20  decision for -- I'm sorry, it was GIS Americas.  He made the

21  decision -- all of the decisions for GIS Americas which was

22  the sort of larger unit in which Ms. Zhao sat.  So she was the

23  smaller group.  She was in the Private Markets which was in

24  GIS which was in Private Wealth Management and Mr. Pace was

25  the head of GIS Americas.

25

1          THE COURT: Do you have any idea of the number of

2    people in GIS Americas or in these different subgroups, how

3    many people we're talking about who were laid off at this

4    time?  Are we talking about within this group hundreds,

5    thousands, twenty?

6          MS. KAISER: No, no.  It was -- I think it would have

7    been under 20 in GIS U.S.

8          THE COURT: In U.S., that's correct.

9          MS. KAISER: In GIS Americas, yes.  I don't know if

10   it's GIS and other countries in the America but in GIS

11   Americas it was under 20 under Mr. Pace who were included in

12   the reduction in force.

13         MR. GOTTLIEB: Again, we think it's inappropriate to

14   look at only the United States considering that this was a

15   worldwide RIF and GIS was not limited to the United States.

16         THE COURT: Well --

17         MS. KAISER: But --

18         THE COURT: But in terms of starting points -- let's

19   put it this way.  The farther afield you get the less relevant

20   it's going to be.  So if you, for example, if you get

21   discovery that uses -- that looks for the names of the --

22   let's call it 20, 20 people who are laid off in this unit in

23   the U.S. and you're not finding anything particularly helpful,

24   they're male, they're female, they're all different races,

25   they're all different ages, nobody else was pregnant, I mean

1   whatever it is, right, you're not finding anything that shows

2   you any kind of pattern.  The only thing you're finding is

3   that there were performance issues or maybe lesser seniority

4   or something that's completely innocent looking in terms of

5   decision making.  To think that oh, you're going to find the

6   relevant information if you start looking at Europe or Asia or

7   wherever else the company was it seems that the utility starts

8   to go down.

9          So the closer the comparison as in I really know

10  this person, I see this person on a regular basis, I know her

11  work personally, I've made the decision that she should be cut

12  because I've looked at the evaluations personally, the closer

13  you are to that -- the hands on decision based on personal

14  knowledge as opposed to delegating for somebody else the

15  stronger the comparison is going to be when you're blaming the

16  decision maker acting out of some kind of animus.

17         MR. GOTTLIEB: Well, Your Honor, there's two issues

18  though.  One, we have disparate treatments and there the issue

19  is whether there's intent.  We also have disparate impact.

20  Your Honor, I think it's important to understand a couple of

21  things.  One is this was a global group.  I mean the work was

22  done on a global level.  It was not limited to New York.  It

23  was not limited to the U.S.  This was a global group and we're

24  entitled to know the way the RIF was carried out by the group,

25  not have a piecemeal production that may benefit defendant's

27

 1   interpretation of the events.  We're entitled to have an

 2   understanding of how the RIF occurred throughout the entire

 3   group and we've limited it, Your Honor, not to the [inaudible]

 4   group of Private Wealth Management but to Global Investment

 5   Solutions which includes two decision makers and the HR woman

 6   involved.

 7           THE COURT: How many people altogether relate off

 8   within that line?

 9           MS. KAISER: I actually don't know.  In all of

10   Private Wealth Management I honestly don't know how many

11   people.

12           THE COURT: We had a number given to us that there

13   were maybe 87 people laid off altogether.  Is that including

14   everything?

15           MS. KAISER:  [Inaudible]

16           THE COURT: So it's going to be less than that in

17   this line; right?

18           MS. KAISER: It's going to be less than that in this

19   line.  We have made the representation repeatedly to Your

20   Honor because we have looked into this carefully that the

21   decisions were made in this reduction force on a regional

22   level which is why I said earlier in this call that to the

23   extent we were to conduct the searches Benjamin Pace would be

24   the logical person because he made the decision to include

25   plaintiff in the reduction in force and he made the decision

1  for GIF U.S.  I mean the decisions were not -- they were made

2  at the regional level.  So it would have been different

3  decision makers --

4         THE COURT: Well, putting -- can you put in something

5  in -- well, first of all, you said that that's your

6  understanding.  Is there something you can point to?  Is there

7  testimony to that effect?  Is there documents to that effect?

8  Is there someone willing to put in an affidavit at this stage

9  to that effect?  Because if decisions are made on a regional

10 level then the regional level is the right place to start

11 looking and plaintiffs can say well, I want to confirm that.

12 Fine, give them something that confirms that but then assuming

13 you can do that and you can confirm what you're saying then

14 you should be more comfortable looking at the regional level.

15        What sounds like is evolving here is number one, go

16 back and look for the kinds of -- the criteria type document.

17 Number two, see if you can get something that gives

18 plaintiff's counsel some comfort that the decision making was

19 really done by people regionally.  Number three, if you've got

20 someone you are saying was the decision maker in this region

21 then broaden the search beyond the plaintiff for that decision

22 maker for that region and let's get cracking with more than

23 just the narrow search that you wanted, and if that turns out

24 in and of itself to be unduly burdensome then make a showing

25 that it really is with somebody who's got knowledge of what

1   it's yielding and meanwhile talk with each other about what

2   the documents are that you're looking for so that in document

3   review you'll understand just what that task is.

4         MR. GOTTLIEB: Your Honor, I just -- I needed to

5   respond on one -- a couple of points.  Kareem Gannem was the

6   head of Ms. Zhao's group and we're not going to be able to

7   just accept a representation by counsel that the head of her

8   group was not involved in the RIF and was not involved in her

9   termination or the termination of other people within his

10  group.  He was the head of this group and so I mean we --

11  we're not going to just accept a representation that he should

12  not be included -- the head of her group should not be

13  included in the protocol for the RIF.  That puts us in a very

14  disadvantageous situation and --

15        THE COURT: Well, I can understand that.  I think

16  that there is some further homework that needs to be done in

17  terms of what the burden would be, what -- how much it adds.

18  Because what you're looking for is a reasonable not overly

19  narrow approach to get the documents you're looking for.

20        In terms of who decision makers were in terms of

21  termination, the decision might --

22        MR. GOTTLIEB: That's what --

23        THE COURT: Hold on, please.  The decision maker

24  might have been a person who makes the ultimate decision after

25  consulting with particular department heads, just consulting

1  with particular supervisors.  What do you think of this

2  person, what do you think of that person, okay I am now making

3  the decision, but there may have been relevant input from

4  people who were closely associated with the plaintiff under

5  whose supervision she worked.

6           So you certainly are already getting I gather

7  documents regarding the RIF and plaintiff and you can see with

8  respect to that whether this person would have given input for

9  example to Mr. Pace.  If that's the case maybe that person

10 gave input regarding others as well and maybe there's a good

11 reason for expanding it.  You also may need to revisit this

12 after some depositions and if plaintiff wants to hold back on

13 some production it may be plaintiff pays the price of

14 producing a person a second time for deposition if it turns

15 out yes, the person did have involvement with making these

16 sorts of decisions in the group and those documents should

17 have been searched and now the person is going to have to come

18 back again.  I'm sure defendant doesn't want that.

19          I think that Gannem and Pace, Messrs. Gannem and

20 Pace both sound like reasonable custodians.  I think you

21 should start looking and see what the production is starting

22 to look like in terms of numbers, in terms of burden, in terms

23 of what kind of effort is involved but if defendant is saying

24 the person who really made the call for the whole region was

25 Pace that certainly is a good point and with Gannem start with

1    the narrower, see what it starts to look like and maybe

2    there's a reason to expand that as well.

3         So the HR person may be a better person to search

4    for criteria or oversight type documents.  Maybe you can limit

5    the types of search terms you're looking for.  Maybe not.

6    Maybe you search all three and you start to say all right, it

7    yielded three million here, 2.2 million here and only 1,000

8    documents from this other person.  Look at that.  Right now

9    we're shooting in the dark.

10        So I think you need to do more talking.  I think you

11   need to do more homework.  My point is that plaintiff may be

12   right that some of this is appropriate.  I'm reasonably

13   persuaded that the place to start is the region.  I'm

14   reasonably persuaded the place to start where there's a person

15   who defendant identifies as a decision maker but plaintiff, if

16   you have some documents you can point to, if you have

17   something other than speculation you can point to that shows

18   that others were really involved in decision making or in

19   setting criteria then I think defendant's counsel ought to

20   listen --

21        MR. GOTTLIEB: Your Honor, there's actually no other

22   individuals that we're asking for.  We're asking for Pace,

23   Gannem and then the HR person who was involved in the RIF and

24   that's it.  We're not -- we haven't even asked for any other

25   custodians.  We've already limited the custodians to the two

1  people who were the direct heads of her specific group and the

2  Level One step up who they have said was the decision maker.

3  So I'm not sure what else -- I mean we've already taken a

4  compromised position here in an attempt to resolve this.  I'm

5  not sure what else we can do.  There are two decision makers

6  and the HR person and one --

7          THE COURT: I'm not saying that you're wrong.  I'm

8  saying go back and do some homework to see what kind of burden

9  this really creates.  I'm not going to say everything that

10  plaintiff is asking for must be done without some further

11  information on this.  I am saying to defendant's counsel that

12  your position is to narrow and that you should start looking

13  into what the actual burden is and looking into what you can

14  provide to plaintiff's counsel to give him more comfort that

15  what you're saying is true about the region, for example.

16          If what defendant's counsel is saying is true then a

17  reasonable place to start as a test to see what kind of burden

18  we're talking about is Mr. Pace for the U.S. region for other

19  people besides plaintiff.  If that turns out not to be so

20  burdensome then great.  If that in and of itself turns out to

21  be hugely burdensome that tells us something.

22          With respect to Gannem, I don't know what that

23  person's involvement might have been.  Maybe there needs to be

24  some test runs there too to see what kind of yield you start

25  to get.  I suspect you're going to have a larger yield with

1   the HR person but nobody knows until you look and try and you

2   can't make the case on burden until you do.  But I'm siding

3   more with plaintiff than with defendant.  I'm just leaving

4   some room for a defendant to come back and explain a) what the

5   burden really is, and b) to come up with some documents or

6   testimony or something that gives some comfort to plaintiff

7   that some of the limitations that defendant is seeking to draw

8   are well founded limitations.  All right?

9          MS. KAISER: Your Honor, defendant is happy to

10  provide an affidavit or documentation substantiating the

11  representations that I've made on this phone call.

12         MR. GOTTLIEB: That's not going to be sufficient.

13  We're entitled to take discovery on who the decision maker --

14         THE COURT: I'm moving on.  I'm moving on.  I'm

15  telling you -- I'm telling you to go back, do some additional

16  homework on burden and see what things start to yield.

17  Provide some more information with respect to criteria.

18  Provide some more information about -- to back up the

19  decisions were made regionally.  I'm not going to order a

20  worldwide production if there's strong evidence that decision

21  making was done regionally because then it would be

22  speculative on your part unless you come up with something

23  that says otherwise.  But I may well say for the region search

24  all three of these decision makers.  I'm sorry, all three of

25  these custodians.  Whether they're direct decision makers or

1  maybe more indirect decision makers or maybe their roles are a

2  little bit different.  I may well say that.  I'm just giving

3  defendant an opportunity to look into this a little bit

4  further and make a little further presentation on the

5  parameters you think are reasonable, why and what the burden

6  would be.

7        So plaintiff can stop being so upset that I'm

8  limiting it.  I'm not.  What I'm saying is let's give a little

9  further -- time for a little further looking into and a little

10  further discussion.  Right now I'm definitely leaning toward

11  Pace for the region and quite possibly Gannem and the HR

12  person as well for the region depending upon what kind of

13  showing can be made about what this is or isn't going to yield

14  and what kind of burden there is or isn't and not speculative.

15        So I'll put you back on the calendar on a short

16  leash and you report back and I'll make some final decisions

17  on it.  I'm just not going to order it all be done now without

18  having a better idea of burden because defendant's counsel

19  hasn't heard me say you're going to have to make the showing.

20  Give her a chance to do that.  Okay?

21        I'm going to go onto the second point because I have

22  another conference scheduled for twelve which is creeping up

23  on me in a hurry.  That is about these additional derogatory

24  search terms that would be prohibitive of gender animus. I

25  have no doubt that if these words are found in documents they

1  would be prohibitive of gender animus.  The only question is

2  what is the basis for believing that these words were used by

3  anybody as opposed to they were used in some other case that

4  you found where they were found to be probative because we

5  don't just have searches for words that are pulled out of the

6  air.  If there's some basis to believe that these words were

7  used -- I think only one of the three words at issue was used

8  in the complaint.  So I don't see any basis to exclude

9  searches to what's actually in the complaint.  But you don't

10 have allegations about the other two words in the complaint so

11 they seem to have come a little bit out of the air.

12       So let me ask that.  Is it just plaintiff's lawyer

13 saying gee, I wonder if these other words were used too or is

14 it that the plaintiff says I've heard people use these terms

15 in talking and I think we're going to find something in emails

16 and we have some basis for looking?

17       MR. GOTTLIEB: Your Honor, they're not -- I wouldn't

18 say they were just pulled out of thin air.  These are terms

19 that would demonstrate gender animus.

20       THE COURT: I agree with you on that but lots of

21 words are --

22       MR. GOTTLIEB: It would be like in a race case, if

23 somebody was terminated in a rape case --

24       THE COURT: In a race case you don't just say let's

25 go into the emails and search for every racist term you can

1    think of.  If you know that a person is prone to using certain

2    terms and you have a basis for that you go search for the

3    terms but you just open the dictionary and say let's search

4    for every word we can think of, the more derogatory the better

5    and see if anybody by any chance said one of these things.  I

6    mean it's not really the way you search --

7         MR. GOTTLIEB: Your Honor, we didn't do that.  Your

8    Honor, we didn't do that.  We only used three words.

9         THE COURT: Right.

10        MR. GOTTLIEB: And the only -- I'm sorry, go ahead,

11   Your Honor.

12        THE COURT: Let's take a specific word.  Let's

13   take -- by the way, we have an electronic recording system on

14   the phone if anyone wants to try to make a transcript but

15   we'll talk about specific words anyway.

16        Let's take the word bitch.  Is there any basis based

17   on any testimony or any document or anybody's [inaudible]

18   evidence that anybody was prone to using the word bitch in

19   this environment?

20        MR. GOTTLIEB: Well, Your Honor, we haven't taken any

21   discovery and I don't imagine that the defendants are going to

22   admit using the word bitch but, Your Honor, there's no

23   prejudice here.  The only prejudice is if they actually used

24   those words.  If they used those words it will come up and

25   it's -- it will demonstrate gender animus.  If they didn't use

1  the words then there's nothing to worry about.

2          THE COURT: Do you have any case law to support

3  that -- not that the word bitch might show a gender animus but

4  that it's appropriate to search for words that you think would

5  show gender animus whether you have any basis for believing

6  the word was used or not?

7          MR. GOTTLIEB: Your Honor, there's actually not a lot

8  of case law on motions to compel involving search terms

9  because I think a lot of ESI protocol disputes or resolves the

10 way we're doing it now.  I can tell you in other cases and I

11 can produce orders in other cases where courts have allowed

12 far -- in sexual harassment cases, for instance, where courts

13 have allowed far reaching terms even if a specific term wasn't

14 used because it would be demonstrative of sexual harassment

15 and animus.

16          Again, we've limited it to three terms.  If any of

17 the decision makers used the term bitch clearly that would be

18 evidence that would show animus and if they use dit obviously

19 it's relevant and we're entitled to it, and that's really our

20 entire position.

21          THE COURT: And on defendant's side --

22          MR. GOTTLIEB: The only --

23          THE COURT: Let me ask on defendant's side.  If you

24 did a search for the word bitch and [inaudible] zero, it

25 didn't show up -- a solo search just for that word and it came

1    up with zero hits that's the end of it.   If it came up with a

2    dozen hits and you open that documents and it turned out

3    people were using this word, why should those documents not be

4    produced on plaintiff's side of this argument?

5         MS. KAISER: Your Honor, our position is that

6    plaintiff has pulled these terms out of thin air.   There's no

7    allegation in the complaint that these terms were ever used,

8    nonetheless used in connection with plaintiff.   We believe

9    that discovery has to have some sort of good faith basis and

10   not be based on arbitrary terms that hypothetically may have

11   been used when there's no allegation.   You asked earlier if

12   there was any documentation or any testimony substantiating

13   the use of these terms and that certainly does not exist but

14   there's not even an allegation in plaintiff's complaint which

15   is quite long and detail as I'm sure you've seen that these

16   terms were ever used in reference to plaintiff or frankly at

17   all by the alleged discriminators at issue.

18        So I just -- to us this is a fishing expedition by

19   plaintiff and we think it's highly inappropriate based on the

20   lack of allegations concerning these terms.

21        THE COURT: I certainly think it's appropriate to do

22   searches that include any of the terms that are used in the

23   complaint, that are referred to in the complaint.   At least

24   one of the terms that were put in front of me as a dispute I

25   think was used in the complaint.

1          MS. KAISER: I'm not recalling that but maybe I'm

2   just misremembering.  David, do you know?

3          MR. GOTTLIEB: I believe the word bitch was in the

4   complaint.  Your Honor, we've also had many cases involving

5   Deutsche Bank and we've -- in the culture where these types of

6   terms are used over and over again --

7          THE COURT: Well, wait a minute.

8          MS. KAISER: That doesn't --

9          THE COURT: Wait.  Wait a minute.

10          MS. KAISER: I'm sorry.

11          THE COURT: First of all, from our look we think,

12   although nobody is perfect, the three terms that were put

13   before me in dispute are bitch, cunt and whore.  We believe

14   that the word cunt was in the complaint and there were some

15   others.  If that's right search for it.  That leaves us I

16   think, and if it's wrong then you'll follow the logic -- by

17   the way, I see my other line flashing at me which suggests

18   that my other call is on.  Hold on a second.  Let me see if I

19   can ask them to call back in a short while which of course

20   will make the next one fall like a domino but hold on a

21   second.

22                    [Pause in proceedings.]

23          THE COURT: All right.

24          MS. KAISER: Your Honor --

25          THE COURT: Wait a minute.  Wait a minute.  With

1   respect to words that are not in the complaint, if the

2   assertion is that there has been another case involving the

3   same employer in the same environment where -- in the same

4   office where there -- words are permeating a culture, where

5   the word bitch was used, okay well, it may be a basis.  If

6   what you're saying is there have been a lot of cases where

7   words "like this" were used, you're not only taking it a step

8   removed from this case to another case but you're talking

9   about words like something and I don't know what words are

10  like what other words because I don't know what words were

11  involved in some other case.

12          So if you've got something concrete that you can

13  point to, even if it's another litigation, if there's a

14  sufficient connection and you've got evidence from somewhere

15  else or even an allegation from somewhere else that the word

16  bitch was used in this working environment okay.  But if

17  you're just saying well, these are words that are sort of like

18  these words in my view, the lawyer came up with other words

19  that the lawyer thinks are similar, these are -- it opens it

20  up to -- how do you pick and choose, which words do you decide

21  to fish for.  If she heard somebody say something I think it

22  should be searched for.  If she never heard anybody say

23  something, nobody else ever heard anybody say something,

24  nobody else in another case that you point to ever heard the

25  person say something, I'm not sure you've got a basis for

1  making somebody else in discovery do search terms -- do

2  searches for words that you've got no -- there's no grounding

3  for.

4        The dictionary is a big thing and you happen to pick

5  some.  You could have picked some others.  Why?  Because a

6  lawyer thought they might be similar?  I think you search for

7  what you have evidence of to try to expand on that and then if

8  you discover in some other document look, there are some other

9  words, that might open the door to further searches for that

10  and one thing leads to another.  But just a hunch that maybe

11  something is there I don't know.  It's problematic because of

12  the kind of -- the kind of logic and the kind of precedent

13  where you say I think we ought to go look for this too because

14  on my hunch that might be there too.  I recognize these words

15  are all of -- I wouldn't say similar meaning but you can see

16  relatedness.

17        So I'm a little bit more on the fence than my

18  comments just now might betray because like I said if

19  defendant were to search -- and maybe the answer is you do the

20  isolated just see if you get any hits at all with the word

21  without any other words with it and just see and if it turns

22  out there are in fact documents and maybe plaintiff's hunch

23  was well -- was a good one based on circumstance and if

24  there's a nothing, no harm, no foul, there's nothing to

25  produce, but I'm troubled by the concept.  I'm troubled by the

42

1   concept of nobody testified, nobody made an allegation and

2   there's no existing document, there's no informal word of

3   mouth from statements from witnesses.  There's no anything

4   that these words were used in the workplace and yet defendant

5   should go look for them because where could that lead as a

6   general principle in discovery.

7          MR. GOTTLIEB: Again, Your Honor, we limit -- we

8   tried to limit it here.  There's no harm by the defendant

9   conducting a search and if the terms were used they're used.

10  If they're not, they're not used.  The only way we'll ever

11  know if they were used because no one is ever going to admit

12  to it is if we do the search -- if we use the search terms.

13         THE COURT: I don't know.  I think in the end I think

14  this is going to be -- the cost is going to be on defendant to

15  go back and do a second search.  If the defendant does a

16  search that is broad enough to talk about plaintiff's

17  termination and the termination of others in connection with

18  the reduction in force and it turns out that there are others

19  who are women and derogatory terms are used in the emails by

20  the same supervisory crew and there's another word in one of

21  those documents it's going to open up to searches for other

22  words that are in those documents to explore more broadly and

23  see what's found.

24         But I am a bit reluctant to just start off with

25  searches that are broader than anything that anybody is

1   willing to say they ever heard in the workplace when you're

2   talking about derogatory language like this.  I'm concerned

3   about where that leads us in the next case and the next case

4   or in the next round of discovery.  So right now I would say

5   limit it to what is in the complaint and if on defendant's

6   side if you want to put it to be bed to fend off any kind of

7   meaningful appeal and you just do it for your own interest

8   sake anyway and it turns up with a zero you can say I did it

9   anyway, it turned up with a zero, now go away.  If it turns up

10  with something then defendant in good faith better be looking

11  at those documents but in terms of ordering it, I am -- I'm

12  really hesitant to order production of words that came out of

13  the lawyer's head and don't have the specific grounding in

14  terms of ever being overheard in the workplace.  I'm just

15  worried about where that takes us in terms of the next logical

16  step.

17          MR. GOTTLIEB: Again, Your Honor, I think we -- okay.

18          THE COURT: If I'm right with respect to what's in

19  the complaint you get one out of three anyway.  Defendant take

20  back what I said and think about it.  Unless --

21          MS. KAISER: We will do so, Your Honor.

22          THE COURT: Yes.  Unless you can show me some

23  authority that's even analogous somehow that other words that

24  the lawyer thinks might be related -- look, obviously with

25  reduction in force you might say layoff is related but that's

44

1  a little different in character than what --

2         MR. GOTTLIEB: I can, Your Honor, so you -- I can

3  [inaudible] protocols ordered by other judges that --

4         THE COURT: Will I know what it was based on?  Will I

5  know if the lawyer said my client heard people use these

6  words?

7         MR. GOTTLIEB: I can certainly -- yes, the complaint

8  -- the ESI protocol was established in other cases that we've

9  done before depositions but after there's only been a

10  complaint.

11         THE COURT: Right.  But the question is did you say

12  to the judge my client never heard anybody say this but we,

13  the lawyers, think it's a related enough term that we should

14  get it or did you say to the other judge my client heard this

15  word and the judge said fine, the client is saying she heard

16  this word?

17         MR. GOTTLIEB: It was the former, Your Honor, and I'm

18  speaking of a sexual harassment case that I litigated before

19  Judge Wexler in the Eastern District where this same issue

20  came up and it was the former.  It was words that were

21  reasonably related to other terms that had been used and to

22  the theory of the complaint.  Again, here I thought we tried

23  to keep the terms very limited only to the actual decision

24  makers and only to terms that typically are used and

25  demonstrate gender animus.  Again, I think there's no harm in

1   them running the search terms.  There's no -- there's

2   literally very, very little cost to them at all and then we

3   know if the decision makers were used terms to demonstrate

4   gender animus.

5          THE COURT: You know what?  Let me put you back on

6   the calendar for a short time out.  Go back and do a little

7   more thinking.  Do a little more talking.  On defendant's side

8   do a little more consulting.  Come back on this point too.

9   Right now I'm not ordering anything beyond what the terms are

10  that are in the complaint or if plaintiff wants to give some

11  kind of statement beyond that but I assume what she's got is

12  in the complaint.  But I'll give it some more thought.

13  Defendants should give it some more thought and I'll take a

14  look at anything you have to show me from another case.  It's

15  sort of my concern precedent follows precedent.  That's

16  exactly what people do.  They take this one, they go to the

17  next judge, they take the next one, go to the next judge.

18  This one just -- I find it a little bit troubling but I'll

19  give it some further thought.

20          Let me get you on pretty soon again to follow up on

21  this and just to pin things down.  I'm sorry for being vague

22  but I want to give counsel, especially on defendant's side, a

23  little time to mull over these thoughts and maybe reformulate

24  some positions.

25          Today is October 31st.  Maybe one day next week.  I

1   don't know how long it will take on defendant's side to run

2   some searches and get some information about what it's really

3   -- what kind of volume is really coming up or if there are any

4   other burden issues you want to bring to my attention that are

5   specific.

6           MS. KAISER: Your Honor, I think we're going to need

7   more time than because we are still -- we expect to receive

8   the data from our client any day but it still has to be

9   processed which we're dealing internally at Kramer Levin.  So

10  I just don't exactly know when that will be complete and after

11  it's processed we can start to run searches and [inaudible]

12  searches and that kind of thing but we expect to receive the

13  data this week.  So I'm hoping by tomorrow but I --

14          THE COURT: What data are you talking about?

15          MS. KAISER: The emails.  We don't actually have the

16  emails.  They're being collected by our client for the nine

17  custodians but because there was nine custodians there's a ton

18  of data.

19          THE COURT: I'm sorry.  You're collecting all of

20  their emails or you're collecting certain emails?

21          MS. KAISER: They're collecting all of their emails

22  for the agreed upon time frames and then we internally at

23  Kramer Levin are running the agreed upon search terms.  So

24  it's as you can imagine a lot of data for nine custodians.

25          THE COURT: Well, can you -- is it possible for you

1  to prioritize?  So, for example, Mr. Pace seems particularly

2  important.  Mr. Gannem who it seems maybe next is important.

3  Is it possible for you to, or at least with respect to this

4  dispute, others may be important on other issues.  Is it

5  possible for you to put something before something else so

6  that you can --

7          MS. KAISER: I think it's actually all almost done as

8  I said.  I think we're supposed to receive everything.  So

9  it's not --

10          THE COURT: When are you supposed to receive this?

11          MS. KAISER: We're supposed to receive it sometime

12  this week.  So I just need a follow up about an exact time

13  frame we're going to receive it and how long it will take to

14  process depends on the volume of the data.

15          THE COURT: Why don't I put you back on for a week

16  from now and we'll see where things are.

17          MS. KAISER: Okay.  I just --

18          THE COURT: The week after I'm very, very tied up and

19  I don't want to let it go longer than that.

20          MS. KAISER: Okay.  Right.  I'm just quite confident,

21  Your Honor, that the processing takes a few days and then

22  running search terms takes additional time.  So I don't know

23  if within a week from today we're really going to have -- a

24  highly doubt that those steps are going to be able to have

25  been taken by that point in time.

48

1          THE COURT: You can have some further conversations

2   too about what I said and you can see if you find any

3   documents in the HR level and so on.

4          MS. KAISER: We will expedite from --

5          THE COURT: Talk to the tech people.

6          MS. KAISER: We'll expedite from our end certainly

7   Mr. Pace's emails but just the processing and uploading for

8   nine custodians is quite a big task.

9          THE COURT: Well, my problem is the week of the 11th

10  I'm really only here for two days and they're very, very

11  booked and then the week of the 18th is kind of far out to get

12  some resolution on these issues.  If need be we'll kick the

13  can again but I'd rather not.  I'm going to mull over what's

14  been said to me on the argument.  I'm going to ask counsel to

15  mull over and talk to each other.  Maybe the disputes can at

16  least be narrowed by a week from now or maybe I'll just say

17  all right, you need some more certainty, you haven't done this

18  yet but I'm going to make some more definitive rules.  I could

19  have done that today.  I just -- I want to give you a little

20  bit more of a chance to provide me with a little bit more

21  information.

22          I'm sorry it's taken this long to get to having this

23  call too.  I was on trial and things were a little bit crazy.

24  But anyway, let me put you down on Friday afternoon at 3:00 if

25  that's okay.  The 8th.  The end of next week.

49

1          MS. KAISER: That's fine, Your Honor.

2          THE COURT: Can you both do that?

3          MR. GOTTLIEB: That's good, Your Honor.

4          THE COURT: I'll put you down there.  We'll try to

5   get to the end of these issues and by the way, something else

6   that comes under -- it was in my daily with respect to general

7   pretrial supervision is seeing if I can help you with

8   settlement.  I didn't ask it at all but let me just throw it

9   out there.  Have you had any conversations?

10         MR. GOTTLIEB: We did the court order, the SDNY

11  mediation.  We didn't get very far there.  I'm not sure if it

12  would be productive at this point.  Eliza, what are your

13  thoughts?

14         MS. KAISER: Based on the mediation I would say

15  unless plaintiff's position has changed considerably probably

16  not.  We are quite far apart, Your Honor.  We're not obviously

17  opposed to the concept of it but we were quite -- we are quite

18  far apart at the court ordered mediation.

19         THE COURT: Well, next time we won't spend as long on

20  discovery and maybe we'll put on the agenda to talk a little

21  bit about settlement and the settlement positions of the

22  parties and why you have those positions because as the case

23  progresses as you learn things and work with each other

24  positions can change.  Sometimes right out of the box is great

25  because you save litigation expenses and sometimes you need to

50

1  have things percolate a little bit more.  But it is something

2  that I'm going to want to follow up with you on.

3          So while you're talking internally see if there's

4  any potential movement from either side on settlement and be

5  prepared to talk to me about that when we reconvene.  Okay?

6          MR. GOTTLIEB: Very good.  Thank you, Your Honor.

7          MS. KAISER: Thank you, Your Honor.

8          THE COURT: Thanks for your patience.  Bye-bye.

9                         *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

51

1     I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5                                 _____

6                                        Shari Riemer

7  Dated:   May 13, 2014

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25